UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x

JAY EPSTEIN,

                                  Plaintiff,

-against-

THE CITY OF NEW YORK, THE NEW YORK CITY
POLICE      DEPARTMENT,      ADMINISTRATIVE
LIEUTENANT   JIMENEZ,   SERGEANT   RINALDI,
LIEUTENANT FRANCIS COLE (in their individual and
official capacities),

                                 Defendants.

----------------------------------------------------------------------- x

**NOTICE OF MOTION FOR
SUMMARY JUDGMENT**

06 CV 3788 (TPG)(AJP)

        **PLEASE TAKE NOTICE** that upon the accompanying Declaration of Kevin A. Madden in support of Defendants' Motion for Summary Judgment, dated October 31, 2008, and the exhibits annexed thereto, Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated October 31, 2008, the Memorandum of Law in Support of Defendants' Motion for Summary Judgment, dated October 31, 2008, and all the papers and proceedings heretofore had herein, defendants City of New York, New York City Police Department (hereinafter "NYPD"), Lieutenant Joseph Jimenez and Lieutenant Francis Cole (collectively, "defendants") will move this Court, before the Honorable Thomas P. Griesa, at the United States Courthouse for the Southern District of New York, located at 500 Pearl Street, New York, New York, on a date to be determined by the Court, for an order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting summary judgment in favor of defendants and for such other and further relief as may be just, proper and equitable.

**PLEASE TAKE FURTHER NOTICE** that, pursuant the Court's order, dated

September 16, 2008, plaintiff's opposition papers shall be served no later than December 1, 2008

and defendants' reply papers, if any, shall be served, no later than December 22, 2008.

Dated:       New York, New York
             October 31, 2008

                                   MICHAEL A. CARDOZO
                                   Corporation Counsel of the City of New York
                                   Attorney for Defendants
                                   100 Church Street, Room 2-122
                                   New York, New York 10007
                                   (212) 788-0880
                                   kmadden@law.nyc.gov

                          By:      _Kevin A. Madden_____
                                   Kevin A. Madden (KM 4999)
                                   Assistant Corporation Counsel


TO:      **Tom Ricotta, Esq.**
         Leeds Morelli & Brown, P.C.
         One Old Country Road
         Suite 347
         Carle Place, NY 11514
         (516) 873-9550

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

| | |
|---|---|
| JAY EPSTEIN,<br><br>                              Plaintiff,<br><br>            -against-<br><br>THE CITY OF NEW YORK, THE NEW YORK CITY POLICE DEPARTMENT, ADMINISTRATIVE LIEUTENANT JIMENEZ, SERGEANT RINALDI, LIEUTENANT FRANCIS COLE (in their individual and official capacities),<br><br>                            Defendants. | **DEFENDANTS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1**<br><br>06 CV 3788 (TPG)(AJP) |

------------------------------------------------------------------------ x

Pursuant to Local Rule 56.1 of the Civil Rules of this Court, defendants City of New York, New York City Police Department (hereinafter "NYPD"), Lieutenant Joseph Jimenez ("Lt. Jiminez"), and Lieutenant Francis Cole ("Lt. Cole")[1] submit their statement of material facts as to which there is no genuine issue to be tried:

1.       Plaintiff, a retired police officer formerly employed by the NYPD, brings this action pursuant to 42 U.S.C. § 1983, the New York State Executive Law §§ 296-297 ("SHRL") and Title 8 of the New York City Administrative Code ("CHRL") alleging that he was discriminated against based upon his sexual orientation and retaliated against for filing

---

[1] Lieutenant Jeff Rinaldi (hereinafter, "Lt. Rinaldi") is misidentified in the caption as "Sergeant Rinaldi." Upon information and belief, Lt. Rinaldi was never served with a summons and complaint in this action.

internal complaints of discrimination.   See Complaint, dated March 27, 2006 (hereinafter, "Compl."), annexed as Exhibit "A" ¶¶ 10, 12-15, 20.[2]

2.      Specifically, plaintiff alleges that, due to his sexual orientation:  1) he was denied sufficient overtime to increase his pension during his final year of employment before retirement; 2) he was assigned "rookie" assignments that were not commensurate with his experience; 3) he was issued poor performance evaluations; and 4) he was transferred to an undesirable work location. See Exh. "A," ¶¶ 12-15.

3.      Plaintiff also claims that he was retaliated against for filing two (2) complaints of discrimination with NYPD's Equal Employment Opportunity office ("EEO") on about January 21, 2005 and March 15, respectively.  See id., ¶¶ 18, 20-21.

4.      Finally, plaintiff asserts that his resignation from NYPD on July 31, 2005 constituted a constructive discharge.  See id., ¶ 22.

## A.      Background

5.      Plaintiff alleges that he is a gay male.  See Exh. "A," ¶ 10.

6.      Plaintiff began his employment as a police officer with NYPD in July 1985. See Exh. "A," ¶ 8.

7.      Plaintiff testified at his deposition that, upon joining the police force, he was not "openly gay," and did not tell any of his co-workers or supervisors that he was gay.  See plaintiff's deposition, dated June 12, 2007, annexed as Exhibit "B" at 80:6-15; 84:22-25; 85:14-16.

---

[2] References to all exhibits are to those annexed to the Declaration of Kevin A. Madden, dated October 31, 2008, ("Madden Decl.") submitted herewith in support of defendants' motion for summary judgment.

8.    Plaintiff admitted at his deposition that during his employment with NYPD, he never informed any of his co-workers or supervisors that he was gay.  See id. at 84:22-25; 85:14-16; 91:15-19; 92:24-25; 93:1-4, 13-15.

**B.    90th Precinct**

9.    Plaintiff alleges that he was assigned to the 90th Precinct from 1986 to 1991.  See id. at 43:23-25; 44:1-2; 50:23-24.

10.    Plaintiff never informed anyone at the 90th Precinct that he was gay.  See id. at 47:23-25.

11.    Plaintiff alleges that he applied for and was granted a transfer from the 90th Precinct to the 61st Precinct in 1991.  See id. at 43:23-25; 44:1-2; 50:25; 51:1-6, 13-17; 53:17-18.

**C.    61st Precinct**

12.    At the 61st Precinct, plaintiff was assigned duties of foot patrol, car patrol, hospitalized prisoner duty, prisoner escort duty, and emotionally disturbed person ("EDP") calls.  See Exh. "B" at 55:7-21.

13.    Plaintiff testified at his deposition that that "once in a while" during his tenure at the 61st Precinct, he was assigned "lousy" assignments such as foot patrol duty, hospital duty, and patrol car duty when the weather temperature outside was allegedly 90 degrees.  See id. at 56:22-25; 57:1-5.

14.    Plaintiff alleges that these assignments were discriminatory based upon his sexual orientation.  See id. at 56:16-21.

15.    Plaintiff never informed anyone at the 61st Precinct that he was gay, nor did he ever discuss his sexual orientation or his sex life with anyone at the 61st Precinct.  See id. at 57:12-14; 59:8-13.

16.    During plaintiff's assignment to the 61st Precinct, no person ever uttered any discriminatory or derogatory remarks regarding plaintiff's sexual orientation.  See id. at 57:9-11; 64:1-2.

17.    Plaintiff testified that during his tenure in the 61st Precinct, he was "usually" granted overtime if it was available.  See id. at 131:15-17.

18.    Plaintiff worked at the 61st Precinct from 1991 until 1999.  See Exh. "B" at 53:19-20.

**D.    PSA 5 Housing Project Assignment**

19.    In or about 1999, plaintiff was transferred from the 61st Precinct to the PSA 5 Housing Project ("PSA 5").   See id. at 56:11-18; 57:5-8; 59:16-18.

20.    Plaintiff alleges that his transfer to PSA 5 was discriminatory based on his sexual orientation. See id. at 56:11-18; 57:5-8; 65:10-21.

21.    Plaintiff never discussed his sexual orientation with any of his co-workers at PSA 5, nor did plaintiff ever tell any of his police partners that he was gay.  See id. at 84:22-25; 85:14-16.

22.    Plaintiff admits that his transfer in 1999 was due to a city-wide "reshuffling" wherein ninety-nine ("99") other police officers were transferred to different commands.   See id. at 64:11-23; 75:6-11.

23.    Plaintiff admits that the tasks he was assigned at PSA 5 were within his job description.  See id. at 66:21-25.

24.    Plaintiff was assigned to PSA 5 from 1999 to approximately August 2001. See id. at 65:22-24; 71:10-14.

25.    Plaintiff admits that he was not discriminated against during his tenure at PSA 5. See id. at 71:15-18.

26.     Soon after his transfer to PSA 5 in 1999, plaintiff applied for a transfer to the 68th Precinct.  See id. at 71:6-9.

**E.     68th Precinct**

27.     On about August 1, 2001, pursuant to his transfer request, plaintiff was assigned to the 68th Precinct.  See id. at 72:10-13; 132:23-25.

28.     At the 68th Precinct, plaintiff alleges that he was assigned prisoner escort duty, EDP calls and hospital runs, assignments that he alleged were not commensurate with his experience.  See id. at 136:1-13; 146:23-25.

29.     Plaintiff testified that he estimated he was given such assignments "half the time, sometimes it was almost a whole week, sometimes two days during the week."  See id. at 148:12-15.

30.     Plaintiff further testified that other officers in the 68th Precinct were also assigned these duties.  See id. at 135:8-25.

31.     Plaintiff's first partner at the 68th Precinct was Joanne Ryan ("Officer Ryan"), and plaintiff and Officer Ryan were assigned to patrol car duty together.  See id. at 133:9-15.

32.     Plaintiff admits he never told Officer Ryan that he was gay.  Plaintiff testified, however, that Officer Ryan "must have known" that he was gay because he never discussed his having a girlfriend with Officer Ryan.  See id. at 85:22-25; 86:1-14, 25; 87:1-17.

33.     Plaintiff testified that he went to social functions with Officer Ryan, and attended a Christmas party with Officer Ryan where he danced with her.  See id. at 97:6-16.

34.     Plaintiff cannot recall if he implied to others at NYPD that he was dating a woman, but admitted it is possible that he did so.  See id. at 83:25; 84:1-4, 16-18.

**F.    January 4, 2003 Command Discipline**

35.    On January 4, 2003, plaintiff was issued a Command Discipline notice ("CD") for failure to use sound judgment.  See id. at 138:1-13.  Specifically, the CD stated that plaintiff and Officer Ryan "utilized P.O. Ryan's private vehicle to proceed to and while present at their assigned post" notwithstanding "specific instructions prohibiting the utilization of private vehicles."  A copy of the January 4, 2003 CD is annexed as Exhibit "C."

36.    Plaintiff testified that he accepted the command discipline without disputing its merit and acknowledged that his acceptance of the CD was an admission of guilt. See id. at 138:19-23.

**G.    June 16, 2003 Command Discipline**

37.    On June 16, 2003, plaintiff was issued a CD by Sergeant John Lam ("Sgt. Lam") for leaving his assigned post without contacting the patrol supervisor for permission to do so.  See id. at 138:24-25; 139:1; see also, June 16, 2003 CD, annexed as Exhibit "D."

38.    Plaintiff signed off on the CD and did not dispute or challenge it.  See Exh. "B" at 138:24-25; 139:1-14.

**H.    September 2003 Command Discipline**

39.    In or about September, 2003, plaintiff was issued a CD by Sergeant Thomas Stefanelli ("Sgt. Stefanelli") which alleged that plaintiff had failed to properly prepare a report.  See Exh. "B" at 140:14-16.

40.    Plaintiff accepted this CD and did not dispute or challenge it. See id. at 141:1-2.

**I.    2003 Performance Evaluation**

41.    In or around January 2004, plaintiff was issued his 2003 annual performance evaluation by Sgt. Sandra Butler ("Sgt. Butler") for the period from December 2002

- 6 -

through December 2003 (the "2003 evaluation") which rated plaintiff as "Below Competent."
See Exh. "A" ¶ 15; see also, copy of the 2003 evaluation, annexed as Exhibit "E."

42.    In the 2003 evaluation by Sgt. Butler, plaintiff was ranked "low" in the
areas of "Apprehension/Intervention," "Processing Arrests," "Vouchering," "Comprehension
Skills," "Judg[]ment," and "Drive/Initiative." See Exh. "E."

43.    Plaintiff's evaluation noted that in 2003, plaintiff received three (3)
command disciplines on three separate dates by three different supervisors. See id.

44.    The evaluation further stated:

> Although PO Epstein accrued 42 total quarterly
> points for the year, which is minimal activity, he
> has been a constant nightmare for all concerned.
> Since my assignment as PO Epstein's supervisor, I
> have personally observed the following behavior:
> Officer does not respond to emergency jobs unless
> communication strictly assigne[d] the job to his
> sector. *PO Epstein often reclassifies serious
> offenses to lesser offenses to keep from making
> arrests, notifications, preparation of paper work.
> PO Epstein pretends not to know how to handle
> certain jobs, despite the fact [that] he is [the] most
> tenure[d] officer in my squad.* His colle[a]gues
> dislike working in the sector with him although
> Officer Epstein is currently in his eighteenth (18)
> year of service. PO Epstein has never been
> disrespectful. He is always polite and courteous to
> rater, but he tries to take the easy way out when
> performing his police duties.

See id. (emphasis added).

45.    The reviewer of the 2003 evaluation, Captain William Aubry, stated in the
evaluation:

> Since the date of my assignment to this command
> (1/04), *PO Epstein's supervisors have advised me
> that he fails to exhibit and any form of initiative and
> is in need of constant supervision to ensure the
> minimum requirements of his position are*

> *completed.   Additionally, PO Epstein's supervisors*
> *have cited his inability to properly follow directives*
> *and ongoing errors.    Reviewer recommends*
> *continued special monitoring from all supervisors.*

See id. (emphasis added).

46.     Plaintiff admitted at his deposition that prior to this 2003 evaluation, he received "above standard" evaluations only "a few times" and admitted that the majority of the annual performance evaluations issued during his employment with NYPD rated his performance as "meets standards." See Exh. "B" at 76:21-25; 77: 1-8.

47.     Plaintiff alleges, upon "information and belief," that Lt. Francis Cole ("Lt. Cole") ordered Sgt. Butler to allegedly lower plaintiff's performance evaluation. See Exh. "A," ¶ 16.

48.     Lt. Cole testified that he has never instructed a Sergeant to modify the performance rating of a police officer. See Deposition of Lt. Cole, dated June 20, 2007, annexed as Exhibit "F," at 9:3-12.

49.     Plaintiff testified that he never informed Lt. Cole, or anyone in the 86th Precinct, that he was gay.   See Exh. "B" at 85:14-25; 86:1-10.

50.     Lt. Cole testified that he only became aware that plaintiff alleges that he is gay after plaintiff filed his lawsuit naming Lt. Cole as a defendant. See Exh. "F" at 19:1-5.

51.     Lt. Cole further testified that he had no knowledge that plaintiff filed internal EEO complaints that alleged discrimination based on his sexual orientation. See id. at 20:1-7; 26:22-25 ; 27:1-10.

52.     Lt. Cole testified that he never heard rumors that plaintiff was gay. See id. at 19:6-9; 29:23-25; 30:1-3.

53.     Lt. Cole testified that he believed that plaintiff was having a "fling" with a female, Officer Ryan.  See id. at 19:6-16.

54.     Lt. Cole further testified that plaintiff never complained to him that he was being treated differently.  See id. at 21:22-25.

55.     On or about July 15, 2004, plaintiff appealed the 2003 evaluation, but the appeal was denied.  See Exh. "A," ¶ 15; see also, Exh. "B" at 142:1-8.

56.     Plaintiff was never disciplined as a result of the 2003 evaluation.  See id. at 144:17-25; 145: 4-6.

57.     However, plaintiff claims that as a result of his 2003 evaluation, he was denied a requested assignment to Police Headquarters in June 2004 that would have afforded him more overtime such that he could have "retired with a much greater pension."  See Exh. "A," ¶ 17; see also, Exh. "B" at 122:1-25; 171:25; 172:1-25; 173:1-8.

## J.     Overtime

58.     In March 2004, plaintiff alleges that, that he began to request overtime assignments for his last year of employment with NYPD in order to increase his pension upon retirement.  See Exh. "B" at 106:17-21; 129:11-17.

59.     Plaintiff alleges that it was a common practice for retiring police officers to get extra overtime in their last year before retirement to increase their pension.  See id. at 98:18-23; 99:1-13; 100:5-8; 106:17-21.

60.     Plaintiff alleges that he was denied overtime by Lt. Jiminez and Lt. Rinaldi due to his sexual orientation.  See Exh. "B" at 100:5-13; 109:1-5; see also, Exh. "A," ¶ 12.

61.     Lt. Rinaldi testified that he never became aware that plaintiff filed internal complaints of discrimination alleging that he was gay.  See Exh. "G" at 21:6-13; 29:18-24.

62.     Lt. Rinaldi testified that no one ever discussed, commented on, or questioned plaintiff's sexual orientation in his presence.   Lt. Rinaldi also testified that he never heard a rumor that plaintiff was gay.   See id. at 23:22-25; 24:1-3; 29:14-24.

63.     Finally, Lt. Rinaldi testified that he believed that plaintiff was dating Officer Ryan. See id. at 29:18-24; 30:13-16.

**K.     Prospect Park Assignment**

64.     Effective May 1, 2004, plaintiff was temporarily assigned to the "Prospect Park Detail" assignment due to "level staffing needs for the summer detail."  This assignment was effective until approximately October 2004.  See Exh. "A," ¶ 18; see also, Exh. "B" at 96:19-23; 108:5-9; see also, Transfer List, dated April 27, 2004, annexed as Exhibit "H."

65.     Plaintiff alleges that he was transferred to Prospect Park due to his sexual orientation. See Exh. "B" at 150:1-3.

66.     Plaintiff admits that other officers from other commands were transferred during that time.  See id. at 149:14-17.

67.     Plaintiff alleges that, during his tenure on Prospect Park detail, on one day he was assigned to foot patrol when "there was going to be a thunderstorm."  See id. at 151:12-25; 152-16-25.

68.     Plaintiff testified that, while assigned to Prospect Park detail, he was not assigned hospital runs or EDP calls.  See id. at 163:13-16.

69.     Plaintiff testified that his salary did not change once he was assigned to Prospect Park and he was not disciplined during his Prospect Park assignment.  See id. at 152:16-25; 153:1-10; 163:17-23.

**L.     Application for Transfer to Headquarters**

70.     In June 2004, plaintiff applied for a transfer to Headquarters.  See id. at 171:25; 172:1-7.

71.     Plaintiff wanted to transfer to Headquarters to build up his pension through overtime.  See Exh. "B" at 173:1-8, 14-19.

72.     Captain William Aubrey recommended plaintiff for the transfer to Headquarters.  See Aubrey recommendation, annexed as Exhibit "I."

73.     Plaintiff alleges that he was denied the opportunity to work for Headquarters due to his 2003 evaluation.  See Exh. "A," ¶ 17.

**M.     September 30, 2004 Performance Evaluation**

74.     On about September 30, 2004, plaintiff was issued a performance evaluation by Sergeant Shawne Scott for the rating period from May 2004 through September 2004.  A copy of the September 30, 2004 performance evaluation is annexed as Exhibit "J."

75.     The performance evaluation stated:

> PO Epstein often does not retain information concerning his assignments.  He requires re-instruction regarding his post boundaries and conditions that need to be addressed on his post.
>
> PO Epstein often needs clarification of written and verbal communications.  His compliance to written and spoken orders often required follow-up instructions and explanations.
>
> *PO Epstein's often questions directives of his supervisors.*  He shows little concern for the feelings of his peers.  *He is a police officer who despite his many years on the job, does not display any leadership ability.*
>
> *PO Epstein's performance is marginal.  He displays limited ability in performing basic assignments.  At times he seems unwilling to perform his duties, but will comply upon demand.*

See id. (emphasis added).

76.     The reviewer of the evaluation, Lt. Elisa Anders, stated in the evaluation:

> PO Epstein *requires excessive instruction when being assigned the most basis duties. The undersigned has not yet determined whether this is an unwillingness to perform the duty or simply a serious listening/comprehension problem. Further PO Epstein has been unable to gain the respect of both his peers and supervisors.* Recommend he returns to his permanent command.

See id. (emphasis added).

## N.     Level II Performance Monitoring

77.     On September 16, 2004, plaintiff was placed on Level II performance monitoring. See Exh. "A," ¶ 17.

78.     NYPD Policy mandates that once a police officer receives two below standard performance evaluations in a three-year time period, the police officer shall be placed in the Level II Performance Monitoring Program for eighteen (18) months. See Performance Monitoring Program policy, annexed as Exhibit "K," at 6-8.

79.     Plaintiff alleges that he was placed on Level II performance monitoring because he is gay. See Exh. "A," ¶ 17; see also, Exh. "B" at 117:18-25; 123:5-16; 162:15-25; see also, Notice of Level II performance monitoring, dated October 14, 2004, annexed as Exhibit "L."

80.     The Level II performance monitoring policy states that "[m]embers placed in Level II are evaluated quarterly, closely supervised and recommended for additional training, if appropriate." See id. at 6.

**O.     Return to 68th Precinct**

81.     On about October 27, 2004, plaintiff was returned to the 68th Precinct after his temporary assignment to Prospect Park had concluded.  See Exh. "B" at 165:6-25; 166:6-12.

82.     Upon his return to the 68th Precinct, plaintiff requested and received overtime.  See id. at 167:7-22.

**P.     November 30, 2004 Performance Evaluation**

83.     On about November 30, 2004, plaintiff was issued a performance evaluation by Sgt. Stefanelli with the rating of "Below Competent" for the period from December 16, 2003 through May 4, 2004.  The performance evaluation stated:

> Officer Epstein requires con[s]tant supervision with regard to paperwork, all forms submitted must be checked for accuracy and completeness.
>
> Officer Epstein when faced with any problem cannot determine a proper cause of action instead he will rely on the immediate supervisor for the answer even though he has 19 years of patrol experience.
>
> *Officer Epstein requires constant direction and prompting with regard to assignments given either verbally or written.*  He rarely, if ever, volunteers to do added work.
>
> Although Officer Epstein i[s] not directly assigned to this rater[,] I have noticed the following:  *He exhibits little if any initiative and must be directed to perform assignments.  Once directed to do so, he needs constant supervision to ensure completion.  Also, Officer Epstein fails to assist fellow officers with regard to backup and support.*  Officers on the platoon when assigned to work with him, will often ask for an assignment change.

See November 30, 2004 evaluation, annexed as Exhibit "M" (emphasis added).

84.     As the reviewer of the evaluation, Lt. Cole stated:

- 13 -

> Police Officer Epstein's supervisors continuously
> advise me that he fails to exhibit any knowledge or
> understanding of department procedures, directives
> or guidelines. He is in need of constant supervision
> to ensure minimum requirements of his position are
> completed.      Recommend    continued    special
> monitoring from all supervisors.

See id.

## Q.    December 2004 Performance Profile

85.    In or about December 2004, plaintiff was issued a Uniformed Performance Monitoring Profile ("Performance Profile") for the period from September 2004 through December 2004 that rated his overall performance as "Low." A copy of the December 2004 Performance Profile is annexed as Exhibit "N."

86.    The Performance Profile ranked plaintiff's summons activity as "unimpressive," his arrest activity as "small number of poor quality arrests," his response to calls for service as "slow in responding to 'routine' calls" and his work activity as "performs to minimum standards only." See id.

## R.    2004 Performance Evaluation

87.    In January 2005, plaintiff was issued an annual performance evaluation by Sergeant Thomas Devine ("Sgt. Devine") for the period from December 2003 through December 2004 ("the 2004 evaluation"). A copy of the 2004 evaluation is annexed as Exhibit "O."

88.    Sgt. Devine stated in plaintiff's evaluation that "even though P.O. Epstein is the senior member of [my] squad, he has minimal knowledge on how to process an arrest" and "P.O. Epstein needs supervision on tasks such as row towing a vehicle even though he has the most tenure in his squad." See id.

**S.      January 20, 2005 Command Discipline**

89.      On January 21, 2005, plaintiff was issued a CD from Sergeant John Lam ("Sgt. Lam") for his failure to respond to a tow vehicle request.  See CD, dated January 21, 2005, annexed as Exhibit "P"; see also, Cole Depo., Exh. "F" at 39:5-24.

90.      Plaintiff's partner, Officer Kenneth Flores, was also issued a CD.  See Cole Depo., Exh. "F" at 39:5-24.

91.      Plaintiff accepted the CD.  See Exh. "P."

**T.      First EEO Complaint**

92.      On about January 21, 2005, plaintiff filed an internal complaint of discrimination with NYPD's EEO (the "First EEO Complaint").  See Exh. "A," ¶ 18; see also, January 21, 2005 EEO Case Report, annexed as Exhibit "Q"; see also, January 25, 2005 EEO complaint, annexed as Exhibit "R."

93.      In his EEO complaint, plaintiff asserted that, due to his sexual orientation, he was treated differently because he received "less prestigious" assignments, unfair evaluations, and unfair distribution of overtime.  See First EEO Compl., Exh. "R"; see also, Exh. "B" at 145:23-25; 146:4-7; 175:16-21; see also, EEO Investigating Officer's Report, dated February 23, 2005, annexed as Exhibit "S" at 1-2.

94.      Though plaintiff reported to EEO that he received "rookie" assignments, he also stated to EEO that he chose not to work with a partner.  See EEO Investigating Officer's Report, Exhibit "S," at 2.

95.      Plaintiff acknowledged during his EEO interview on January 25, 2005 that he did receive overtime assignments but that "it was not enough overtime for someone who was about to retire."  See id.

96.     Plaintiff also advised EEO that "he had not heard comments regarding his sexual orientation." See id.

97.     Plaintiff testified at his deposition that he did not inform Lt. Cole, Lt. Rinaldi or Lt. Jiminez that he filed an EEO complaint, and he further testified that none of those officers ever mentioned to plaintiff that they had knowledge that plaintiff had filed an EEO complaint. See Exh. "B" at 176:7, 15-18.

98.     EEO conducted an investigation of the First EEO Complaint. See Exh. "S."

99.     In its investigation, EEO determined the following:  1) that Sgt. Butler's comments in the 2003 evaluation "d[id] not appear to be from someone who did not want to give/or was forced to give someone a poor evaluation and that Deputy Inspector William Aubry concurred with Sgt. Butler's assessment of plaintiff; 2) that plaintiff was evaluated for the period from May 2004 until September 2004 and rated "Below Standard" and that Sgt. Scott stated in the review that plaintiff "display[ed] limited ability in performing basics assignments"; 3) that it appeared from plaintiff's evaluations that, due to plaintiff's "poor work habits," "few officers wanted to work with [him]"; 4) that plaintiff was aware that "undesirable tasks are part of his job" but of the opinion that "there is an unwritten rule that these assignments should be assigned to 'rookies'"; 5) that plaintiff was receiving overtime although he complained it was "not enough overtime for someone who was about to retire"; 6) and that plaintiff had never heard comments regarding his sexual orientation but believed that "there was an overall 'feel' [that] the precinct is anti-gay." See Exh. "S."

100.    By letter dated March 3, 2005, plaintiff was advised that his complaint "did not rise to the level of employment discrimination under Title VII of the Civil Rights Act of

1964, or applicable state or local laws." A copy of the March 3, 2005 EEO letter is annexed as Exhibit "T."

### U.    March 7, 2005 Command Discipline

101.    On March 7, 2005, plaintiff was issued CD by Sgt. Butler that stated:

> Officer Epstein did fail to conduct a proper investigation at the scene of a burglary. Upon further investigation[,] Patrol Supervisor did discover that officer failed to conduct a complete canvass at premise and that an additional apartment had been burglarized.

A copy of the March 7, 2005 command discipline is annexed as Exhibit "U."

102.    Plaintiff alleges that he was issued this CD in retaliation for filing his First EEO complaint. See Exh. "B" at 177:6-16.

103.    The CD was not adjudicated, and no penalty was rendered against plaintiff. See id. at 120:16-21; 121:10-17; 177:6-12.

### V.    Second EEO Complaint

104.    On March 15, 2005, plaintiff contacted EEO by telephone to file a second EEO complaint (the "Second EEO Compl."). See Exh. "A," ¶ 20; see also, Exh. "B" at 177:18-21.

105.    Plaintiff complained to EEO that he had been retaliated against because he was issued one (1) CD from Sgt. Butler on March 7, 2005 and one CD from Sgt. Lam on January 20, 2005. Plaintiff alleged that the CD's were issued in retaliation for filing a previous EEO complaint. See copy of the EEO Investigating Officer's Report, dated March 15, 2005, annexed as Exhibit "V" at 1.

106.    In his phone call to EEO, plaintiff did not allege discrimination based on his sexual orientation or any other protected activity. See id.

107.    Plaintiff also reported to EEO in his March 15, 2005 phone call that he had "not discussed the facts of his previous [January 25, 2005] EEO complaint *with anyone* and that "Sgt. Butler was not privy to that complaint, nor was she told she was named as a witness." See id. at 1 (emphasis added).

108.    Plaintiff then submitted a written complaint to EEO as a follow up to his phone call.  Plaintiff did not allege in the written complaint that he was being discriminated against on the basis of his sexual orientation or any other protected category.  A copy of the March 2005 EEO Complaint is annexed as Exhibit "W."

109.    Instead, plaintiff asserted that he was being given undesirable assignments, such as EDP's and hospitalized prisoner assignments.  Plaintiff also asserted that he was going to retire soon and wished to increase his pension through overtime, but that overtime was being distributed "unfairly."   See id.

110.    EEO conducted an investigation regarding plaintiff's complaint.  A copy of the March 15, 2005 EEO investigator's report is annexed as Exhibit "X."

111.    In its investigation, EEO determined that:  1) plaintiff stated he had been issued a CD from Sgt. Lam and a CD from Sgt. Butler but also stated that "he was unsure whether these command disciplines were even issued at all; 2) that he had not discussed the facts of his previous EEO complaint with anyone; 3) that plaintiff was "unaware [that] Sgt. Lam had any knowledge of [the prior] EEO complaint;" 4) that plaintiff was "not even sure he received [CD's] and just wanted it noted that if he does receive CD's, that in his opinion, they are in retaliation for his EEO complaint"; 5) that plaintiff "admitted [to EEO] that [neither] Sgt. Lam [nor] Sgt. Butler had any knowledge that [plaintiff] filed a [previous] EEO complaint"; and 6) that based on the results of plaintiff's interview by EEO and based on a "review of the facts

presented" that "[n]o prima facie case of employment discrimination/retaliation [was] articulated." See id.

112.    By letter dated March 18, 2005, Neldra M. Zeigler, Deputy Commissioner of EEO, advised plaintiff that his Second EEO Complaint "did not rise to the level of employment discrimination under Title VII of the Civil Rights Act of 1964, or applicable state or local laws." A copy of the March 18, 2005 EEO letter is annexed as Exhibit "Y."

**W.    Plaintiff's Formal Overtime Request and Notice of Retirement**

113.    In a memorandum from plaintiff to Deputy Inspector William Aubrey, dated April 1, 2005, plaintiff stated that he would retire from service on July 31, 2005 and that he was "requesting overtime during the [m]onth of April and May 2005. See id. at 109: 11-16; see also, April 1, 2005 memorandum, annexed as Exhibit "Z."

114.    This was the first instance that plaintiff submitted his request for overtime in writing. See Exh. "B" at 111:4-6.

115.    One week after plaintiff submitted his memorandum, he was assigned an overtime assignment. See id. at 111:8-24.

**X.    Terminal Leave**

116.    In April 2005, plaintiff took leave from work called "terminal leave." See id. at 112:3-11; 181:7-11.

117.    Plaintiff testified that police officers go out on terminal leave in anticipation of retirement and that, after his terminal leave concluded, plaintiff submitted his application for retirement from NYPD. See id. at 181:12-16.

**Y.     Plaintiff's Retirement**

118.    On or about July 31, 2005, plaintiff retired from NYPD.  See Compl., ¶ 22.

119.    Plaintiff alleges that he retired from NYPD because of discrimination and because his mother was in poor health.  See Exh. "B" at 181:17-24; 183:1-5.

120.    Plaintiff alleges that his retirement from NYPD constituted "constructive termination."  See Compl., Exh "A," ¶ 22.

121.    Upon his retirement from NYPD, plaintiff received full pension benefits.  See Exh. "B" at 195:10-25.

122.    Plaintiff alleges that the NYPD personnel that allegedly knew he was gay were Lt. Jiminez, Lt. Cole, and Lt. Rinaldi.  See id. at 90:1-7.

123.    Plaintiff testified, however, that he never informed Lt. Jiminez, Lt. Cole, or Sgt. Rinaldi, or any other person at the NYPD that he was gay.  See id. at 84:22-25; 85:14-16; 91:15-19; 93:1-4, 13-15.

124.    At no time during his employment with NYPD did plaintiff join a gay police officer's league affiliated with the NYPD.  See id. at 80:12-21; 81:18-25; 82:1-3.

125.    At no time during his employment with NYPD was plaintiff affiliated with a gay group outside of NYPD.  See id. at 88:9-11.

126.    Plaintiff was a member of a society for Jewish police officers within the NYPD, but he told no one in that group of his sexual orientation.  See Exh. "B" at 82:4-20.

127.    Plaintiff never brought a man as a date to any NYPD social function.  See id. at 83:15-20.

128.    Plaintiff was never served with formal disciplinary charges during his employment with NYPD.  See id. at 178:19-25; 179:1-4.

**Z.      The Instant Action**

129.    On or about April 17, 2006, plaintiff filed the instant action in Supreme Court, Bronx County.  A copy of the Court Alert record indicating that plaintiff purchased an index number for the action on April 17, 2006 is annexed as Exhibit "AA."

130.    On or about May 17, 2006, defendants removed the action to the U.S. District Court of the Southern District of New York.

**MICHAEL A. CARDOZO**
Corporation Counsel of the
 City of New York
Attorney for Defendants
100 Church Street, Room 2-122
New York, New York 10007-2601
(212) 788-0880

By:

Kevin A. Madden (KM 4999)
Assistant Corporation Counsel
kmadden@law.nyc.gov